IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2021

## IN RE JASON S.

**Appeal from the Juvenile Court for Hamblen County**
**No. J190017 Janice Hope Snider, Judge**

_____

### No. E2020-01479-COA-R3-PT

_____

Appellant/Mother appeals the trial court's termination of her parental rights to the minor child on the grounds of: (1) abandonment by failure to visit, Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(i); (2) abandonment by failure to provide a suitable home, Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(A)(ii); (3) substantial noncompliance with the requirements of the permanency plan, Tenn. Code Ann. § 36-1-113(g)(2); and (4) persistence of the conditions that led to the child's removal, Tenn. Code Ann. § 36-1-113(g)(3). Appellant also appeals the trial court's finding that termination of her parental rights is in the child's best interest. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KRISTI M. DAVIS, J., joined.

Ryan T. Logue, Morristown, Tennessee, for the appellant, Patsy S.[1]

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

### I. Background

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

Appellant Patsy S. ("Mother") is the biological mother of Jason S. (d/o/b April 2008) (the "Child").[2] Mother's history with the Appellee, Department of Children's Services ("DCS"), began in April of 2008, when Mother admitted to using illegal drugs during her pregnancy with the Child. Between 2008 and 2010, there were several other referrals alleging that the Child was the victim of drug exposure by Mother. In 2016, a neighbor made a referral to DCS alleging that the Child was the victim of sexual abuse. It was later confirmed that the Child was, in fact, sexually abused by his cousin.

Giving rise to the instant appeal, on February 5, 2019, DCS received a referral that the Child was the victim of "environmental neglect, improper supervision, and drug exposure, perpetrated by the [Mother]." DCS visited Mother's home the same day. During conversations with the Child and Mother, DCS learned that the Child had witnessed numerous arguments between Mother and Taylor S., Mother's paramour. DCS also discovered that Taylor S. had assaulted Mother on two separate occasions and that there was an outstanding warrant for his arrest stemming from the domestic violence. While DCS was at the home, case workers contacted authorities, and Taylor S. was taken into custody on the outstanding warrant.

In his conversation with DCS, the Child stated that Mother drank alcohol, and the DCS case worker confirmed that she noticed several beer cans and liquor bottles in the home and observed that Mother smelled of alcohol. Mother also submitted to a drug screen, which was positive for methamphetamine and marijuana. Mother denied using methamphetamine but admitted to using marijuana. DCS also found Mother's residence to be unsanitary and cluttered. DCS noted animal feces and dried urine stains about the home and also noted a lack of food.

On February 6, 2019, DCS filed a petition for emergency custody in the Juvenile Court of Hamblen County ("trial court") on the ground that the Child was dependent and neglected. The trial court subsequently appointed a guardian ad litem ("GAL") for the Child and an attorney for Mother.[3] In a protective order entered on February 6, 2019, the trial court noted that Mother waived the preliminary hearing and agreed that there was probable cause to find the Child dependent and neglected. In addition to finding probable cause that the Child was dependent and neglected, the trial court also made a specific finding that DCS had made reasonable efforts to prevent removal. The trial court placed custody with DCS, and Mother was allowed supervised visits after testing negative for methamphetamine on or about March 31, 2019.

---

[2] Child's father, Jason S., Sr., is deceased.
[3] Mother was found to be an indigent person pursuant to Tennessee Code Annotated section 37-1-126 and Supreme Court Rule 13, Section 1(d)(2).

Following a hearing, the trial court entered an adjudicatory order on April 10, 2019, wherein it found, by clear and convincing evidence, that the Child was dependent and neglected "for all reasons set out in the [petition for emergency custody]." In its order, the trial court noted that Mother submitted to a drug screen on the day of the hearing and tested positive for methamphetamine, amphetamines, and marijuana. Because Mother's visitation was contingent on her testing negative for drugs, the trial court reduced her visits to supervised telephone conversations. The trial court ordered DCS to assist Mother with inpatient treatment and to assist her with outpatient treatment thereafter.

On June 14, 2019, the GAL filed a motion to suspend Mother's visitation entirely. As grounds, the GAL alleged that: (1) during telephone contact with the Child, Mother was often intoxicated and inappropriate with the Child; (2) the Child's foster mother had notified the GAL that Mother offered the foster mother money to allow Mother to "kidnap" the Child; and (3) Mother was making physical threats to DCS employees. Following a hearing, the trial court granted the GAL's motion by order of August 26, 2019 (*nunc pro tunc* to August 21, 2019) and suspended all contact between Mother and the Child. Later, on March 20, 2020, Mother filed a petition seeking to resume supervised visitation. By order of May 13, 2020, the trial court reinstated Mother's supervised telephone visits on the condition that she pass random drug screens and exercise appropriate behavior during the telephone calls.

During the course of these proceedings, DCS worked with Mother to develop two permanency plans. The first plan, dated March 1, 2019, required Mother to: (1) maintain stable housing; (2) show proof of stable and legal income; (3) complete a non-offender domestic violence class and follow all recommendations thereof; (4) complete a mental health assessment and follow all recommendations thereof; (5) complete a parenting assessment and follow all recommendations thereof; (6) complete an alcohol and drug assessment and follow all recommendations thereof; (7) submit to random drug screens and pill counts; (8) provide proof of reliable transportation; (9) follow all court orders; (10) attend regular visits with the Child, behave appropriately at visitation, and provide notice of cancellation at least 24 hours in advance; and (11) inform DCS if anyone over the age of 18 stayed in Mother's home for more than 2 nights. The second permanency plan was entered on April 3, 2020. Mother's requirements under the second plan were the same as those listed in the first permanency plan with one additional requirement that Mother complete a "medication" assessment to address Mother's prescriptions. Both plans were ratified and entered by the trial court on its finding that the requirements outlined in the plans were appropriate, reasonably related to addressing the issues that required removal, and were in the Child's best interest.

Concerning its efforts to assist Mother with meeting the requirements of the permanency plans, DCS filed two affidavits of reasonable efforts. The first affidavit was filed on August 19, 2019. Concerning Mother's progress, the affidavit indicated that Mother attended two visits with the Child but noted that visitation was suspended due to

- 3 -

the fact that Mother was unable to pass drug screens. However, DCS acknowledged that Mother completed a parenting assessment on June 17, 2019. In its second affidavit of reasonable efforts, which was filed on May 1, 2020, DCS noted that, "There has been limited progress on the Permanency Plan thus far, as [Mother] has yet to complete her Mental Health or Alcohol and Drug assessment. [Mother] completed a parenting assessment; however, she has not followed through with completing the recommendations at this time." DCS further noted that Mother had been uncooperative with its efforts to arrange the necessary assessments.

On March 18, 2020, DCS filed a petition to terminate Mother's parental rights on the grounds of: (1) abandonment by failure to visit; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with the requirements of the permanency plan; (4) persistence of the conditions that led to the Child's removal; and (5) failure to manifest an ability and willingness to parent.[4] DCS also alleged that termination of Mother's parental rights was in the Child's best interest. As noted above, two days after DCS filed the petition to terminate her parental rights, on March 20, 2020, Mother petitioned the trial court to reinstate her visitation.

The hearing on DCS' petition was scheduled for September 23, 2020. Mother did not appear at the scheduled time. The trial court delayed the start of the hearing for three hours after Mother stated, by telephone, that she would attend. Despite her indication that she would participate at the hearing, Mother ultimately did not attend, and the trial proceeded without her. The sole witness was DCS caseworker, Zach Maples.

By order of October 21, 2020, the trial court terminated Mother's parental rights on the grounds of: (1) abandonment by failure to visit; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with the reasonable requirements of the permanency plan; and (4) persistence of the conditions that led to the Child's removal. The trial court also found that termination of Mother's parental rights was in the Child's best interest. Mother appeals.

## II. Issues

We restate the dispositive issues as:

1. Whether there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on any of the statutory grounds found by the trial court.

---

[4] At the hearing on its petition, DCS voluntarily withdrew the ground of "failure to manifest a willingness and ability to parent," and the trial court did not rely on this ground in terminating Mother's parental rights.

- 4 -

2. If so, whether there is clear and convincing evidence that termination of Mother's parental rights is in the Child's best interest.

### III.  Standard of Review

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643,

653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings *de novo* and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523-24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). The Tennessee Supreme Court has explained that:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review *de novo* with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re [A.M.H.]*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524. With the foregoing in mind, we turn to our review.

## IV. Grounds for Termination of Parental Rights

Although only one ground must be proven by clear and convincing evidence in order to terminate a parent or guardian's parental rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d at 251 n.14. Accordingly, we will review all of the grounds relied upon by the trial court.

### A. Abandonment

The trial court found, by clear and convincing evidence, that Mother abandoned the Child by failure to visit and failure to provide a suitable home. We begin our analysis with a discussion of the ground of abandonment generally. In pertinent part, Tennessee Code Annotated section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1).

## 1. Abandonment by Failure to Visit

Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that: (i) For a period of four (4) consecutive months immediately preceding the filing of a . . . petition to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . . have failed to visit . . . the child;

\*\*\*

(E) For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period;

Tenn. Code Ann. §§ 36-1-102(1)(A)(i), (1)(E). Here, DCS filed the petition to terminate Mother's parental rights on March 18, 2020. Therefore, the relevant four-month time period for this ground is November 18, 2019 until March 17, 2020. *See **In re Jacob C.H.***, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at \*6 (Tenn. Ct. App. Feb. 20, 2014) (explaining that the four-month window does not include the date the petition was filed).[5]

Since 2018, the statutory definition of abandonment has placed the burden of proof on the parent or guardian to show that the parent's failure to visit was not "willful." Tennessee Code Annotated section 36-1-102(1)(I) provides, in relevant part, that:

For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit . . . that a parent or guardian's failure to visit . . . was not willful. The parent

---

[5] In its order terminating Mother's parental rights, the trial court states that the relevant four-month period runs from November 18, 2019 to March 18, 2020. As noted in **In re Jacob C.H.**, 2014 WL 689085, the four-month period does not include the date on which the petition was filed; as such, the relevant four-month period in this case ran through March 17, 2020, not March 18, 2020. We note that, in its petition, DCS avers that Mother failed to visit in the four months immediately preceding the filing of the petition. As such, it appears that Mother was fully apprised of the pertinent time period, and the trial court's miscalculation of the relevant period by one day does not constitute reversible error. *See, e.g.*, **In re Navada N.**, 498 S.W.3d 579, 600 n.12 (Tenn. Ct. App. 2016) (explaining that "the trial court's error of five days regarding the correct calculation of the four-month period is not determinative . . . in the interest of providing a speedy resolution for [the Child].").

or guardian shall bear the burden of proof that the failure to visit . . . was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure. . . .

Tenn. Code Ann. § 36-1-102(1)(I). Concerning willfulness in the context of abandonment for termination of parental rights purposes, this Court has stated:

> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. . . .
>
> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted).   In other words, failure to visit is willful "when a person is aware of his or her duty to visit . . . , has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864 (citing *In re M.J.B.*, 140 S.W.3d at 654).   "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment . . . is a question of law." *In re Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re A.M.H.*, 215 S.W.3d at 810).   As previously discussed, this Court reviews questions of fact *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523-24.  We review questions of law *de novo* with no presumption of correctness. *In re Angela E.*, 402 S.W.3d at 640 (citing *In re A.M.H.*, 215 S.W.3d at 810). With the foregoing in mind, we turn to address whether Mother abandoned the Child by failure to visit.

Concerning this ground, the trial court made the following findings:

> In this case, the Court found it necessary to issue an order prohibiting [Mother] from in person visitation with the child until she could provide proof of methamphetamine-free screens for thirty days.  [Mother] provided this proof on March 31, 2019 and was granted supervised visitation with the child.  Unfortunately, her supervised visits with [the Child] were once again

revoked on August 26, 2019 due to [Mother's] inappropriate conduct. [Mother] often called the [C]hild while she was intoxicated. She cursed and threatened his foster mother on at least one occasion. [Mother] was advised that she could resume supervised visitation when she demonstrated that she could conduct herself in a proper manner during visits and provided proof of sobriety; however, she failed to do so. Consequently, during the relevant four-month [] period . . . [Mother] had no contact at all with [the Child].

Moreover, [Mother] was given the opportunity to appear at the TPR hearing and provide evidence to rebut that her failure to visit was not willful. The Court waited three hours for [Mother] to appear after she reported just prior to the start of the trial that she had problems with finding transportation. The Court questions [Mother's] veracity after she became belligerent on the telephone prior to the commencement of the trial and gave inconsistent accounts of her situation that day.

Based upon these facts, the Court finds by clear and convincing evidence that . . . [Mother] abandoned her child . . . when she failed to make any . . . efforts to visit her child or . . . any effort to resolve the no contact order.

Here, it is undisputed that Mother had no contact with the Child during the relevant four-month time period as she was under a no-contact order. However, pursuant to the no-contact order, Mother was allowed to seek visitation upon filing to reinstate it and presenting herself to the court. As such, the no-contact order does not preclude application of this ground. At all times, Mother had the power to seek reinstatement of visitation by filing a motion to that effect and presenting herself to the court to demonstrate that she could conduct herself appropriately during visits and provide proof of sobriety. *See In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845, at *6 (Tenn. Ct. App. June 30, 2014) ("This Court has often held that when a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit.") (citing *In re Elijah B.*, No. E2010-00387-COA-R3-PT, 2010 WL 5549229 at *8 (Tenn. Ct. App. Dec. 29, 2010); *Tenn. Dep't of Children's Servs. v. J.A.H.*, No. E2005-00860-COA-R3-PT, 2005 WL 3543419 at *6 (Tenn. Ct. App. Dec. 28, 2005) (holding that the father's decision not to submit to testing that was a precondition to further visitation constituted a "willful decision to discontinue visiting his son")).

In this case, Mother was provided a copy of the Criteria and Procedures for Termination of Parental Rights on March 1, 2019 and again on January 9, 2020. As such, she was aware that her failure to visit the Child could result in the termination of her parental rights. Nonetheless, in the approximately seven months between entry of the no-contact order and the filing of the petition to terminate her parental rights, Mother did not seek to reinstate visitation. It was not until March 20, 2020, two days after DCS filed its petition to terminate her parental rights, that Mother made any effort to resume visitation.

It is well established that any efforts made to visit a child after the filing of a termination petition do not negate or repent abandonment. Tenn. Code Ann. § 36-1-102(1)(F) ("Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child[.]"); *In re S.R.M.*, No. E2008-01359-COA-R3-PT, 2009 WL 837715, at *12 (Tenn. Ct. App. Mar. 27, 2009) (holding that Tenn. Code Ann. § 36-1-102(1)(F) precludes consideration of a parent's "after-the-fact" efforts regarding visitation.).

As noted in the trial court's order, Mother failed to attend the hearing on the petition to terminate her rights. As such, the foregoing facts are undisputed and Mother has not met her burden to show that her failure to visit was not willful. The record contains clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of abandonment by failure to visit.

## 2. Abandonment by Failure to Provide a Suitable Home

The trial court found, by clear and convincing evidence, that Mother abandoned the Child by failure to provide a suitable home. Tennessee Code Annotated section 36-1-113(g)(1) authorizes termination of parental rights on the ground of abandonment as defined by Tennessee Code Annotated section 36-1-102(1)(A)(ii) when:

> (ii)(a) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
>
> (b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the

department;

Tenn. Code Ann. § 36-1-102 (1)(A)(ii).

Concerning the first and second statutory elements, it is undisputed that the Child was removed from Mother's custody by court order of February 6, 2019. As noted above, in the February 6, 2019 order, the trial court found probable cause that the Child was dependent and neglected and placed custody with DCS. Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(a). The trial court also made a specific finding that DCS made reasonable efforts to prevent removal. Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(b). This finding is undisputed, and the record shows that prior to filing the petition for custody, DCS attempted to locate a placement for the Child within the family.

We now turn to the final statutory element, i.e., whether DCS made reasonable efforts to assist Mother in establishing a suitable home for a period of four months following the Child's removal, and whether Mother made reciprocal efforts to establish same. Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(c). As an initial matter, we note that DCS' efforts to assist a parent "shall be found to be reasonable if such efforts equal or exceed the efforts of the parent. . . toward the same goal. . . ." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). Additionally, "[a] suitable home 'requires more than a proper physical living location.'" *In re Navada N.*, 498 S.W.3d at 595 (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). It requires "[a]ppropriate care and attention . . . to the child[ren]." *In re Matthew T.,* No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). Further, "a parent's compliance with counseling requirements is 'directly related to the establishment of a suitable home.'" *Id*. (citing *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009)). Indeed, "the problems and conditions for which the various . . . counseling efforts were conducted address matters[,] which make the home environment suitable for raising children. . . ." *In re M.F.O.*, 2009 WL 1456319, at *5.

Turning to the record, DCS caseworker Mr. Maples testified concerning DCS' efforts to assist Mother in establishing a suitable home and the lack of any substantial reciprocal efforts on her part. The Child was removed from Mother's custody on February 5, 2019. The four months immediately following removal were from February 6 to June 5, 2019. Even so, this Court has held that DCS meets the reasonable efforts requirement "if it establishes that reasonable efforts were made during any four-month period following a child's removal." *In re Roderick R.*, No. E2017-01504-COA-R3-PT, 2018 WL 1748000, at *11, n. 13 (Tenn. Ct. App. Apr. 11, 2018), *perm app. denied* (Tenn. July 12, 2018) (citing *In re Jakob O.*, No M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Sept. 20, 2016)). Here, the record indicates that DCS made reasonable efforts to assist Mother throughout the entirety of the proceedings.

DCS created two permanency plans to assist in the goal of returning the Child to Mother's custody. To assist Mother in completing her requirements under those plans, DCS: (1) provided Mother with resources to apply for housing; (2) informed Mother of educational opportunities that would allow her to obtain suitable employment; (3) assisted Mother in obtaining parenting, mental health, and alcohol and drug assessments; (4) attempted to assist Mother in completing long-term alcohol and drug treatment; (5) facilitated supervised visits with the Child; and (6) provided information on domestic violence programs in the area. Despite DCS' efforts, Mother did not make reciprocal efforts to rehabilitate herself and to remedy the conditions that required DCS to remove the Child.

Mother's failure to address her drug and alcohol abuse was a primary impediment to reunification. When DCS attempted to transport Mother to a rehabilitation facility at the end of June 2019, Mother refused to go inside the hospital and was abusive and threatening to the DCS caseworkers; she used profanity and propositioned the male caseworker. Throughout the proceedings, Mother continued to abuse alcohol and drugs as evidenced by numerous positive drug screens.

Concerning the conditions inside Mother's home, in September 2019, she reported a bed bug infestation. Eventually, Mother moved into a new home in April 2020. However, evidence adduced at trial showed that the new home was not suitable for the Child. Mr. Maples reported that he visited the home in May 2020 to facilitate a supervised telephone call between Mother and the Child, but Mother would not allow him entry as she said there were five dogs in the home and she did not want him to get bitten. Mr. Maples observed several open bags of trash and several empty liquor bottles in the yard.

Perhaps more troubling is the fact that Mother continued to live with Taylor S., her abusive paramour. In addition to being arrested on an outstanding domestic violence warrant during DCS' initial visit to the home, Taylor S. was arrested on charges of domestic violence against Mother twice more during the pendency of this case, i.e., on February 18, 2020 and June 16, 2020. By the time of trial, the Child had been in DCS custody for approximately 19 months, and Mother had yet to provide proof of attendance at a non-offender domestic violence class.

In its order terminating her parental rights, the trial court found that:

It is apparent that DCS made more than reasonable efforts to assist [Mother] to resolve the issues constituting an impediment to her ability to effectively parent [the Child]. However, she was unable to effectively address her substance abuse and her emotional issues despite the services offered to her. [Mother's] refusal to seek adequate treatment for her addiction and mental health issues prevented her from maintaining a suitable home conducive to the best interest of her child. The Court finds by clear

- 12 -

and convincing evidence that efforts of the department . . . exceeded the efforts by the mother to build a stable home and life for her child.

We agree. "'Parents desiring the return of their children must . . . make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from custody.'" *In re Kambri P.*, No. M2019-01352-COA-R3-PT, 2020 WL 2991793, at *5 (Tenn. Ct. App. June 4, 2020) (quoting *In re Shameel S.*, No. E2014-00294-COA-R3-PT, 2014 WL 4667571, at *5 (Tenn. Ct. App. Sept. 19, 2014)). We conclude that Mother failed to make such reasonable and appropriate efforts, and that DCS' efforts to assist her in establishing a suitable home exceeded Mother's own efforts toward this goal. Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(c). Although DCS provided Mother with services to address her living conditions, drug and alcohol abuse, and domestic violence issues, the record shows that Mother largely refused these services. *See In re M.F.O.*, 2009 WL 1456319, at *5 ("The failure of [m]other and [f]ather to cooperate with DCS and to comply with the requirements of the various counseling services was directly related to the establishment and maintenance of a suitable home."). Mother's failure to take any substantial steps towards addressing the myriad issues that led to the Child's removal demonstrates her lack of concern for the Child and her inability to provide a suitable home environment for him. Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(c); *see In re Roderick R.*, No. E2017-01504-COA-R3-PT, 2018 WL 1748000, at *12 (Tenn. Ct. App. Apr. 11, 2018), *perm. app. denied* (Tenn. July 12, 2018) ("Mother's own failure to comply with her mental health treatment regimen demonstrated her lack of concern for the [c]hildren and resulted in her inability to provide a suitable home environment."). Mother's lack of effort during the 19 months the Child has been in DCS custody indicates that it is very unlikely she will be able to provide a suitable home for the Child at an early date, if ever. Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(c). Accordingly, we affirm the trial court's finding, by clear and convincing evidence, that Mother abandoned the Child by failure to provide a suitable home.

### C. Substantial Noncompliance with Permanency Plan

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of failure to substantially comply with the requirements of the permanency plan. Tennessee Code Annotated section 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan."

"[T]he permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." *In re C.S., Jr., et al.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id.* As discussed by this Court:

Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002); *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548.

*In re M.J.B*., 140 S.W.3d at 656-57.

As discussed above, Mother's requirements under the permanency plans were to: (1) maintain stable housing; (2) show proof of stable and legal income; (3) complete a non-offender domestic violence class and follow all recommendations thereof; (4) complete a mental health assessment and follow all recommendations thereof; (5) complete a parenting assessment and follow all recommendations thereof; (6) complete an alcohol and drug assessment and follow all recommendations thereof; (7) submit to random drug screens and pill counts; (8) provide proof of reliable transportation; (9) follow all court orders; (10) attend regular visits with the Child, behave appropriately at visitation, and provide notice of cancellation at least 24 hours in advance; and (11) inform DCS if anyone over the age of 18 stayed in Mother's home for more than 2 nights; and (12) complete a medication assessment.

In its order terminating Mother's parental rights, the trial court found that

[Mother] participated in the development of the plan and it was subsequently ratified on August 26, 2019. The Court held that the plan was in the [Child's] best interest and that the requirements were reasonably

- 14 -

related to remedying the reasons for foster care . . .

The [trial court] placed considerable weight on [Mother's] requirements to obtain and maintain a safe and suitable home, completion of an alcohol and drug treatment, and completion of a mental health assessment, with follow-up mental health counseling as recommended. These actions were most crucial to enable [Mother] to be alcohol and drug free in order to effectively parent her [Child]. [Mother] completed a clinical parenting assessment, which included an alcohol and drug assessment and a mental health assessment; however, she did not complete the recommended inpatient rehabilitation or individualized therapy. Moreover, no evidence introduced at trial indicates [Mother] completed any requirements on her permanency plan other than these assessments. This [Mother] falls far short of completion of any of the steps that were reasonably related to the reasons for the child's removal.

For these reasons, the Court finds by clear and convincing evidence that [Mother] has failed to substantially comply with the reasonable requirements of the permanency plans in this case.

In view of the fact that the Child was removed from Mother's home for issues involving environmental neglect, drug exposure, and domestic violence, we agree with the trial court that Mother's requirements under the permanency plans were reasonable and related to remedying those conditions that necessitated foster care placement. *See* Tenn. Code Ann. § 37-2-403(a)(2)(C). Unfortunately, Mother failed to comply with the requirements in any substantive way. We note that Mother completed a clinical parenting assessment, which resulted in a recommendation for long-term drug and alcohol rehabilitation with follow up at an aftercare program. Additionally, it was recommended that Mother attend weekly therapy sessions and take parenting classes. Although Mother attended detox three times, she never entered, much less completed, a long-term alcohol and drug rehabilitation program. In addition, Mother refused weekly therapy. At one point, Mother reported that she was attending weekly parenting classes. However, she did not consistently attend the classes, and she did not provide proof of completion of parenting classes to DCS as required under the permanency plans.

During the pendency of this case, Mother also repeatedly tested positive for substances, including methamphetamine, and marijuana. She continued to drink alcohol. Mr. Maples reported that during four or five of his telephone conversations with Mother, he suspected that she was intoxicated due to her slurred speech. Furthermore, Mother was inappropriate in her supervised telephone conversations with the Child. Due to her ongoing alcohol and drug use, Mother threatened the Child's foster mother and the DCS case workers. Mother continued to reside with Taylor S. despite his propensity to abuse her. She did not attend any domestic violence classes.

In its order, the trial court emphasized the need for Mother to maintain a safe and suitable home, to address her alcohol and drug issues, and the domestic abuse within the home. Mother's only step toward these goals was completion of a parenting assessment. However, the mere completion of the assessment without following through with the recommendations is insufficient. There is clear and convincing proof that Mother failed to substantially comply with the reasonable requirements of the permanency plans.

### D. Persistence of the Conditions that Led to the Child's Removal

The trial court also terminated Mother's parental rights under Tennessee Code Annotated section 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds* by *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3)(A). Each of the statutory elements must be established by clear and convincing evidence. ***In re Valentine***, 79 S.W.3d 539, 550 (Tenn. Ct. App. 2002).

Here, the Child was removed from Mother's custody by order of February 6, 2019, and the trial court heard the petition for termination on September 23, 2020, almost 18 months after the Child's removal. The Child was removed from Mother's custody because of environmental neglect, Mother's drug and alcohol abuse, and domestic violence issues in the home.

In its order terminating Mother's parental rights, the trial court found, in relevant part that:

> Over nineteen months have elapsed between the [C]hild's removal and the conclusion of the Termination of Parental Rights hearing in this case. During that time, [Mother] has not resolved or successfully corrected any of the issues that resulted in her [C]hild's placement in the custody of the State of Tennessee. [Mother] had ample opportunity to remedy the conditions leading to [the Child's] removal, but has failed to make any significant improvement in her circumstances. The Court would further note that CM Maples detailed valiant efforts by [various DCS caseworkers]. [One caseworker] endured [Mother's] cursing and name-calling and still continued to help [Mother] by transporting her to the local hospital in an effort to get her into rehab. [Another DCS caseworker] went so far as to sit with [Mother] in the emergency room and hold her while she suffered the symptoms of withdrawal. Both of these DCS workers demonstrated exemplary efforts to held [Mother] despite the horrible treatment she subjected them to . . . .
> CM Maples received the same treatment from [Mother], as he recounted the vulgar names she called him during her multiple intoxicated episodes. In fact, CM Maples advised that, when he last visited [Mother's] home only a couple of weeks prior to the hearing, he observed multiple liquor bottles and several bags of trash outside. [Mother] refused to allow him to enter the home because her five dogs "might bite him." CM Maples' account of his most recent visit to this [M]other's home is strikingly similar to what was observed when the [C]hild was initially removed from her care.

The record supports the trial court's findings. Mother's living conditions have remained ostensibly the same since the inception of this case. She continues to live in unsanitary conditions; she continues to abuse alcohol and drugs; she continues to live with her abuser; and she continues to act out inappropriately with the people who are trying to help her. Based on Mother's failure to address any of these issues during the pendency of this case, it is clear that she will not remedy these conditions at an early date, making it highly

unlikely that Child can be safely returned to Mother's custody in the foreseeable future. It is also clear to this Court that the continuation of Mother and Child's relationship will greatly diminish the Child's chances of early integration into a safe, stable, and permanent home. From the totality of the circumstances, we conclude that there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of persistence of the conditions that led to the Child's removal.

## V. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *In re Bernard T.*, 319 S.W.3d at 606 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793 at 809). As the Tennessee Supreme Court explained:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. As is relevant to this appeal, these factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent;
> (2) Whether the parent or guardian has made such an adjustment after reasonable efforts by available social service agencies for such a duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other

contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent . . . or other person residing with the parent . . . has shown brutality, physical, sexual, emotional, or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child . . . .

Tenn. Code Ann. § 36-1-113(i). This list of factors is not exhaustive, nor does the statute "require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W. 3d 652, 667 (Tenn. Ct. App. Aug. 11, 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Each termination of parental rights case includes different circumstances, and the consideration of a single factor or other factors outside those enumerated in the statute, may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests . . . does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 1994).

In its order terminating Mother's parental rights, the trial court considered the foregoing factors and found that each weighed against Mother. Specifically, the trial court found:

[Mother] has made no adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to return to her home. [Mother] continues to struggle with her addiction to alcohol. She remains, by her own admission, involved to this day with a man who has

- 19 -

physically abused her. Her decisions to continue this unsuitable lifestyle prohibits any chance of [Child] returning to her home. T.C.A. § 36-1-113(i)(1) and (2). At this time, lasting change on the [Mother's] part does not appear likely or forthcoming.

Although [Mother] initially resolved the no contact order by providing proof of methamphetamine-free drug screens, her visitation privileges were short-lived due to her own inappropriate conduct. It is this conduct that has proven detrimental to the continuation of the parent/child relationship. The Court notes that [Mother] and [Child] had a loving relationship prior to this proceeding; however, the relationship has diminished due to the conduct of [Mother]. T.C.A. § 36-1-113(i)(3), (4), and (6) . . .

By [Mother's] admission, her boyfriend, [Taylor S.], was abusive. Their domestic violence incidents resulted in [Taylor S.'s] arrest on more than one occasion. The Child has stated that he worried about his [Mother's] safety and well-being due to her relationship with [Taylor S.]. At the time of the hearing, [Mother] remains with [Taylor S.], and she has grievously neglected her own child. There is nothing about the physical environment of [Mother's] home filled with domestic violence, drug abuse, and alcohol abuse that is safe and healthy for the [Child]. T.C.A. § 36-1-113(i)(7) and (8).

[Mother] disclosed that she was schizophrenic and had not taken her medication for many years; however, an official diagnosis was never confirmed. Nonetheless, [Mother's] behavior during the custodial episode demonstrated that the [Child] was subjected to an unsafe and volatile living situation. In fact, she encouraged [Child] to engage in unhealthy and improper behavior such as stealing from his former foster parent. T.C.A. § 36-1-113(i)(8).

For many of the reasons discussed above, the record supports the trial court's findings. Despite DCS' efforts, Mother failed to avail herself of the opportunities presented to address the issues that made her home unsafe for the Child; rather, she chose to alienate every DCS caseworker. As a result of Mother's behavior and lack of motivation, the conditions that required the Child's removal largely persisted at the time of the hearing on the petition to terminate Mother's parental rights.

Due to her continued drug use, Mother was unable to exercise consistent visitation with the Child. The record indicates that the last time Mother saw the Child was on March 27, 2019. However, even when Mother had the opportunity for telephone contact with the Child, she was often intoxicated and spoke inappropriately. As such, there is no indication in the record that there is any genuine bond between Mother and the Child.

Mother continues to live with her abuser. She continues to live in unsanitary conditions, and she continues to abuse alcohol and drugs. Meanwhile, the record indicates

that the Child has done well in his foster placement, where his needs are met and he enjoys a safe, stable, and loving environment.  To remove him from such environment would likely cause the Child significant distress.  For these reasons and more, we conclude that there is clear and convincing evidence to support the trial court's determination that termination of the Mother's parental rights is in the Child's best interest.

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Mother's parental rights to the Child.  The case is remanded for such further proceedings as may be necessary and are consistent with this opinion.  Costs of the appeal are assessed to the Appellant, Patsy S.  Because Patsy S. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____s/ Kenny Armstrong_____  
KENNY ARMSTRONG, JUDGE
